UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 16-2271-wct

IN RE: SEALED COMPLAINT
_____/

CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
BENJAMIN J. WIDLANSKI
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5501885
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9342
FAX (305) 530-7976

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| JOHN DOE #1, | ) | Case No. 16-2271-WCT |
| a/k/a "Agustin Mendez," and | ) | |
| JOHN DOE #2, | ) | |
| a/k/a "Ever Mendez," | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **April 2014 through March 2, 2016** in the county of **Miami-Dade** in the **Southern** District of **Florida**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1594(b) | Conspiracy to Commit Forced Labor in violation of Title 18, United States Code, Section 1589 |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

William D. Viteri, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/2/16

_____
*Judge's signature*

City and state: Miami, FL.

WILLIAM C. TURNOFF, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, William D. Viteri, having been first duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since 2012, before which I was a Border Patrol Agent with Customs and Border Protection. I am currently assigned to the human trafficking unit of HSI Miami. While employed by HSI, I have participated in numerous investigations related to human trafficking, among other violations of federal crimes. I have gained experience in the investigation of human trafficking crimes through various trainings on investigative techniques, undercover and surveillance work, and through everyday experience relating to the conduct of these types of investigations. I have received specific training in the area of human trafficking, forced labor, and involuntary servitude.

2. This affidavit is made in support of a criminal complaint charging John Doe #1, also known as "Agustin Mendez," and John Doe #2, also known as "Ever Mendez," with conspiracy to commit forced labor, in violation of Title 18, United States Code, Sections 1594(b) and 1589.

3. The statements in this Affidavit are based in part on my investigation of this matter, on information provided to me by other law enforcement agents, and on my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the arrests of John Doe #1, also known as Agustin Mendez, and John Doe #2, also known as Ever Mendez, I have not included each and every fact known to law enforcement concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that John Doe #1 and John Doe #2 committed violations of Title 18, United States Code, Sections 1594(b) and 1589.

1

## GENERAL BACKGROUND

4. The Fair Food Standards Council ("FFSC") is a not-for-profit organization dedicated to the protection of farmworkers' rights. Its mission is to monitor the development of a sustainable agricultural industry that advances the human works of farmworkers, the long-term interests of growers, and the ethical supply chain concerns of retail food companies. As part of its mission, auditors with the FFSC routinely conduct site visits of farms and interview farmworkers regarding labor practices, working conditions, and any allegations of abuse or mistreatment. Under the FFSC's mandate, any substantiated allegations of forced labor, child labor, physical abuse, or sexual abuse must be reported to law enforcement. The FFSC is not a governmental organization and is not controlled by the federal government or any state government.

5. The Fair Food Program was developed through a cooperative agreement between workers, workers' rights organizations, farms, and end-purchasers of produce. The FFSC was established as part of the Fair Food Program in order to audit and enforce compliance with the Fair Food Code of Conduct, which establishes appropriate working conditions, labor standards, and other governing and best-practices for the industry. While not every farm is a member of the program, any farm that wishes to sell to the member purchasers (which include various retail distributors and fast food restaurants, including national chains) must sign on.

6. Farms throughout Florida, including in the Southern District of Florida, employ a hierarchical work structure. At the top of the structure are the farms themselves, which operate as large companies. At individual fields, the farms rely on crew leaders, who are responsible for overseeing entire work sites. Beneath the crew leaders are various middle-managers, such as dumpers and field-walkers. At the bottom of the structure are the farmworkers who physically

harvest the produce. The harvesters pick the crop by hand, fill standard-issue buckets, and bring the buckets to the dumpers, who will exchange a ticket for every bucket filled. Field-walkers walk through the fields to ensure that farmworkers are doing their jobs, and generally oversee the farmworkers. At the conclusion of every work day, the farmworkers will be paid a set amount for each bucket they filled, i.e., every ticket they have. There are other tasks as well, but the harvesting is the principal reason for the employment of the farmworkers.

7. Many crew leaders utilize the services of "nicleros," who operate as brokers of farmworkers' services, in order to supply a steady source of labor. Nicleros receive commissions directly from the crew leaders for every bucket of produce collected by the farmworkers the nicleros provide. Nicleros frequently provide transportation for farmworkers, and recruit farmworkers to their sub-contracting teams. There is often competition between nicleros to recruit laborers and provide their services to farms.

8. Many farms provide temporary housing for the farmworkers who work their fields. This arrangement is mutually beneficial, as it gives the farmworkers access to secure and stable housing and it allows the farms to have a ready labor force in relative proximity to their fields. The nicleros will often transport the workers directly from the housing to the fields and back at the end of the day; some nicleros take advantage of the housing provided by the farms as well. In the absence of company-provided housing, some nicleros will provide workers housing themselves.

9. Nicleros will also often work in the fields themselves, sometimes doing the manual harvesting, other times working in supervisory roles such as field-walker or dumper. While it is illegal for crew leaders or the farms to pay the nicleros directly for the services of the farmworkers, it occasionally happens that a niclero collects the wages of the farmworkers he

3

provides and disperses the money to the workers. This practice is frowned upon within the industry, as it allows the niclero to exercise a great degree of control over the workers.

10. During any given harvest season, the labor crews will follow the work; that is, the farmworkers will travel throughout the state of Florida and up the eastern seaboard of the United States in search of work. Different areas and different crops have different seasons, and farmworkers can stay active throughout the calendar year by moving from one location to another.

11. In South Florida, the tomato season begins in the late fall or early winter and continues through the spring, sometimes ending as late as June. At that time, farmworkers who pick tomatoes will either transition to a different crop or move north in pursuit of new work opportunities. The nicleros will similarly move with the crews, often keeping their crew together for multiple harvest seasons or even multiple years.

12. In its capacity as an auditor, the FFSC has the authority to ensure that growers and nicleros are operating within the Fair Food Code of Conduct. If it identifies a grower, crew leader, niclero, or other individual suspected of violating the Code of Conduct, the FFSC will investigate any allegations. Ultimately, the FFSC has the authority to suspend individuals' work privileges at any farm associated with the Fair Food Program for various lengths of time depending on what violation occurred. In the event of multiple violations or series offenses, the FFSC has the authority to impose lifetime bans. When a ban is in place, a farm cannot employ a particular individual; if notified that they are employing such a person, the farm must immediately terminate that employment.

## FACTS ESTABLISHING PROBABLE CAUSE

A. **Reports to FFSC and Audits**

13. On February 14, 2016, a farmworker, Victim A, placed an anonymous call to a hotline maintained by the FFSC, stating that he had been assaulted by his niclero on February 12, 2016. Victim A informed the FFSC that the niclero had struck him in his face, causing him to bleed, and that the niclero had been verbally and physically abusive of him and the other workers in the crew. Victim A stated that he was afraid of the niclero, who threatened the workers with a baseball bat. Victim A identified the niclero as Agustin Mendez.[1] Over a series of calls, all occurring on February 14, the FFSC asked Victim A to make an eyewitness report to the police, but Victim A refused, saying that he was afraid of Mendez. Victim A stated that if Mendez found out that he had called the FFSC, Mendez would kill him.

14. Mendez was previously known to the FFSC. In January of 2013, auditors from the FFSC received worker reports that Mendez was verbally abusive of the farmworkers at a farm. The FFSC informed the farm, who demoted Mendez from his position as dumper. In February of 2013, the FFSC received additional allegations that Mendez had withheld pay and physically assaulted a farmworker.

15. In January of 2015, there were additional worker complaints regarding Mendez verbally abusing farmworkers and withholding tickets at a worksite. Mendez was placed on probation by the FFSC.

16. On May 7, 2015, Mendez engaged in a physical altercation with a field-walker. As a result of that altercation, Mendez was terminated by the grower. The FFSC was not involved in the termination itself, but was made aware of the incident.

17. On May 31, 2015, the FFSC received a complaint from Witness A regarding an incident in which Agustin Mendez refused to allow a worker to leave the Mendez's crew.

---

[1] Attempts by law enforcement to identify Agustin Mendez in various databases have been unsuccessful. As such, it is possible that Agustin Mendez is an alias, and it is impossible to confirm his true identity. However, for the purposes of this affidavit, he will continue to be referred to as Agustin Mendez.

Witness A was attempting to assist a worker who wanted to leave Mendez's employment, but Agustin Mendez prevented the worker from leaving. Agustin Mendez physically blocked the worker from leaving, made statements regarding pay arrangements, threatened Witness A with violence, and smashed the windshield of Witness A's vehicle. Later, Ever Mendez,[2] Agustin's son, communicated a threat to Witness A over the phone. Witness A filed a police report in Palmetto, Florida. Based on that information, the FFSC placed Agustin Mendez on suspension for the 2015-2016 growing season.

18. On December 10, 2015, the FFSC received information that Agustin Mendez was employed at a participating grower. The FFSC informed the grower that Mendez was on suspension for misconduct, whereupon the grower Mendez terminated Mendez's employment.

19. During farm audits that occurred between February 9, 2016, and February 11, 2016, auditors with the FFSC were made aware that Agustin Mendez was employed by a Fair Foods Program participating grower, and was acting as a niclero. According to the auditors, there was a palpable fear amongst the workers and climate of intimidation. Workers were reluctant to speak with the auditors, and gave very short answers to questions.

B. **Victim A**

20. Victim A is a Mexican national, who has been previously deported multiple times. He stated the following to law enforcement:

a. Victim A became aware of Agustin Mendez through Victim A's father, Victim B, who has been working under Agustin and Ever Mendez for at least four years. Victim B asked Victim A if he wanted to travel into the United States and work for Agustin Mendez. Mendez would make arrangements and facilitate Victim A's transportation into

---

[2] As with his father, law enforcement has been unable to positively identify Ever Mendez. As such, it is possible that Ever Mendez is also an alias and it is impossible to confirm his true identity. However, for the purposes of this affidavit, he will continue to be referred to as Ever Mendez.

6

the United States and, in exchange, Victim A would work in the fields for Mendez. Victim A would also be indebted to Mendez in the sum of $5,000 for the cost of the smuggling. Victim A agreed, and arrived in the United States in January of 2016.

b.      Upon arrival, Victim A learned that Mendez would not be paying Victim A at all, and all the money that Victim A earned would go to Mendez directly. Further, Mendez charged Victim A for food, which was cooked by Mendez's wife, and added those costs to Victim A's debt. As Victim A received no money from his job, he was forced to eat the food provided by Mendez's wife, and incurred additional debt. Mendez took custody of Victim A's government-issued identification and informed him that he would not get it back until the debt was paid off; he also had Victim A sign a contract detailing the debt.

c.      Agustin Mendez's crew of workers all resided in close proximity to one another and to Mendez himself. Mendez himself, as well as his wife and some of the crew, live in 329 Southwest 5th Avenue, Homestead, Florida, 33034 (the Target Premises). Victim A, as well as Victim B and a few other members of the crew, lived very close to the Target Premises in another apartment. Mendez maintains a key to the apartment in which Victim A lived. Most of the crew are either of Mexican or Central American origin. Ever Mendez, who works with his father, resides in a residence that is approximately 10 minutes away by car.

d.      Every morning, Agustin Mendez would awaken the crew members around 4:00 a.m. The crew would leave the residences in either a bus provided by the grower or vans driven by Agustin Mendez and others. When the bus drove the workers, Mendez would be at the field already, and would do a head count of "his" workers to make sure that everyone was present. If there were workers from his crew missing, Mendez would drive

7

back to the residences and force the workers to the fields.

e.     The members of Agustin Mendez's crew were all in fear of Mendez. Mendez would make threats that he would deport the crew members or physically assault them if they did not do as he ordered. Mendez was known to carry around a baseball bat, which he would display in an intimidating manner. Mendez would keep tabs on the amount of money the members of the crew owed him, and maintains ledgers detailing those debts in his residence. Mendez also maintained control over Victim A's paychecks, and would did not allow Victim A to have any cash; Mendez told Victim A that he was applying the paycheck to the outstanding debt Victim A had incurred. Victim A also observed the members of the crew using marijuana, but he is unsure where they get the narcotics.

f.     Victim A could not sustain himself on the amount of food provided by Agustin Mendez, so he sought and eventually found additional employment for after the harvest work was finished. Mendez found out about this employment, and became angry, threatening to deport Victim A, because he was aware of Victim A's immigration status. Victim A mollified Mendez by telling him that he would pay Mendez additional money that he received from this outside employment.

g.     In early February, a member of the crew, Victim C (who resided in the same apartment as Victim A and Victim B), became ill and missed a day of work. The next day, Victim C decided to work in Miami instead of on the farm under Agustin Mendez. When Mendez learned that Victim C was in Miami working, he went back to the residence, and destroyed Victim C's air mattress by cutting it with a knife, and threw all of Victim C's clothing out of the residence. The following morning, after Victim C had returned, Agustin Mendez called Victim A to ask whether Victim C had returned; upon

learning that Victim C had returned, Mendez came over to the apartment carrying the baseball bat and entered using his set of keys. Victim A observed Mendez engage in a verbal altercation with Victim C in Victim C's bedroom, and forcefully prod Victim C in his ribs with the baseball bat. After that, the door to the room was closed.

h. After the altercation, Victim C left the apartment; before leaving, Victim C was very upset and looked frightened. Victim A asked Victim C to call the police, but Victim C told him that he was too afraid to call the police. Victim C never returned to the apartment after that event.

i. Victim A also confirmed the events related to the FFSC on the February 14, 2016, phone call, but provided additional details. After striking Victim A in the face, Mendez told him that if he left, Victim B (Victim A's father) would incur Victim A's debt. Mendez told Victim A that if Victim A worked at all outside of the farms, Mendez would take all of Victim A's earnings. Victim A took pictures of himself after the altercation on a cell phone that belongs to Victim B, documenting his injuries.

j. Victim A attempted to get other workers to report Mendez, but they would not; Victim A also attempted to convince his father to leave, but his father was too afraid of Mendez to leave the crew.

k. Victim A also identified a picture of the Target Premises as where Mendez lives.

## C. Witness A

21. Law enforcement also spoke with Witness A, who stated the following:

a. Witness A confirmed that he did, in fact, file a complaint with the FFSC in May of 2015.

b. He stated that he had previously worked for Agustin Mendez on three different

occasions. He stated that he feared Agustin Mendez and Ever Mendez, and that he was afraid of physical violence or retaliation if he filed complaints against them.

c.      Witness A stated that he had personally observed Ever Mendez physically assaulting and threatening other workers; he had also personally observed both Ever and Agustin Mendez giving instructions and directions to workers.

d.      Witness A identified a particular instance in April of 2014 when he observed Ever Mendez demand money from different workers and, when they refused, he physically assaulted them.

e.      Witness A also observed Ever Mendez providing drugs of an unknown type to workers.

f.      Witness A also confirmed the events related to the FFSC in May of 2015, but provided additional details. Two of the workers in Agustin Mendez's crew, Victim D and Victim E, wanted to leave Agustin's employment. They contacted Witness A, who was staying at the same motel in Sarasota, Florida, and asked Witness A to provide them transportation away from Agustin Mendez. When Agustin Mendez learned that Witness A intended on providing Victim D and Victim E transportation, he physically assaulted Witness A and physically prevented Victim E from leaving the motel. Victim D, who was already in Witness A's vehicle, did leave; as Witness A and Victim D began to drive away from the motel, Agustin Mendez smashed the rear windshield of Witness A's vehicle with a rock and threw a rock after the vehicle as it drove away.

g.      Shortly after this incident, Ever Mendez contacted Witness A via telephone. Witness A recognized Ever Mendez's voice and had Ever Mendez's number stored in his phone. During that phone call, Ever Mendez told Witness A that he learned Witness A

10

had filed a complaint with the FFSC against Agustin Mendez, and told Witness A to withdraw the complaint or Witness A would regret it. When Witness A refused to do so, Ever Mendez immediately terminated the call.

### D. Human Traffickers

22.    Based on my training and experience, I know that persons involved in labor trafficking and involuntary servitude within the United States often keep identification documents belonging to their victims in their residences, often in locked containers. I am aware that persons involved in labor trafficking and involuntary servitude will retain possession of their victims' passports, immigration records, birth certificates, and various forms of identification, among other things.

23.    I am aware that persons engaged in forced labor of migrant workers sometimes carry knives, firearms, or clubs to show force or intimidate victims.

24.    I am also aware that persons involved in labor trafficking and involuntary servitude often force their victims to enter into fictitious contracts or sign other labor agreements, both in order to deceive their victims about the conditions under which they will be working, to obtain authorization from immigration authorities for the victims to enter and work in the United States, and to demonstrate indebtedness to the victims.

25.    Further, I am aware that human traffickers often maintain logs/ledgers and documents to keep track of debts owed and balances to be paid by their workers, and contact information for coconspirators, victims, and other persons that are critical to the commission of their criminal conduct.

### CONCLUSION

26.    Based on the foregoing, I respectfully submit that there is probable cause to

believe that John Doe #1, also known as Agustin MENDEZ, and John Doe #2, also known as Ever Mendez, have committed the offense of conspiracy to commit forced labor, in violation of Title 18, United States Code, Sections 1594(b) and 1589.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Respectfully Submitted,

_____
William D. Viteri, Special Agent
Homeland Security Investigations

Sworn and subscribed before me
this ____ day of March, 2016.

_____
THE HONORABLE WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE